JUDGE DURKIN

MAGISTRATE JUDGE FINNEGAN



RECEIVED EY

7/12/2022

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

**1:22-CV-3680**

JUSTIN MAHWIKIZI,

     **Plaintiff,**

v.                        **CASE NO: _____**

UBER TECHNOLOGIES, INC.,
RAISER, LLC,

     **Defendant.**

_____

**RANDOM**

### COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
### AND DEMAND FOR JURY TRIAL

Plaintiff, Justin Mahwikizi, ("Plaintiff"), on behalf of himself and on behalf of all others similarly situated, brings this Complaint against Defendants, Uber Technologies, Inc., and Raiser, LLC (together "Defendant" or "Uber"), and in support of his claims states as follows:

### PRELIMINARY STATEMENT

1. This Complaint is filed as a collective action under 29 U.S.C. § 216(b), and as a class action under Federal Rule of Civil Procedure 23(b)(1), and is brought by and on behalf of persons who are or have been at some time employed during the applicable limitations period as drivers for Uber Technologies, Inc., a Delaware Corporation with its principal place of business in California, in the business of providing transportation services to the general public.

2.     This Complaint is filed as a collective action under 29 U.S.C. § 216(b), and as a class action under Federal Rule of Civil Procedure 23(b)(1), and is brought by and on behalf of persons who are or have been at some time during the applicable limitations period as riders of Uber Technologies, Inc., a Delaware Corporation with its principal place of business in California, in the business of providing transportation services to the general public.

3.     This is a collective action and a class action which challenges Uber's willful suspension of drivers, and riders from the Uber App for "non-mask wearing" violations.

4.     This is a collective action and a class action which challenges Uber's promissory estoppel violations and willful suspension of drivers, and riders from the Uber App for "non-mask wearing" violations after Uber has provided assurances that reports would be disregarded and would not affect riders' or drivers' ratings.

5.     This is a collective action and a class action which challenges Uber's unjust enrichment on drivers' related profits prior to a willful suspension of drivers, from the Uber App for "non-mask wearing" violations after Uber had provided assurances that reports would be disregarded and would not affect riders' or drivers' ratings, and that drivers could continue driving normally without changing behaviors.

6.     This is a collective action and a class action which challenges Uber's tortious

interference with contractual relations between drivers and riders after both parties have agreed to drive and be driven to final destination by Uber providing a questionnaire to each party on draconian mask-wearing corporate policy.

7.     This is a collective action and a class action which challenges Uber's violation of the American Disabilities Act insofar that Uber's mask wearing policy did not allow for either driver or rider to take down a mask in order to drink, or eat, or laborious breathing due to health conditions; nor did Uber take that into account in deciding whether to suspend a driver or rider.

8.     This is a collective action and a class action which challenges Uber's uniform policy of willfully misclassifying its drivers as independent contractors when, in fact, each such driver is and/or was an employee of Uber; and when, in fact, Uber exerted full control of the rides rather than truly allowing drivers to be independent contractors.

9.     As a result of Uber's unlawful misclassification of its drivers as independent contractors, Uber has uniformly violated the requirements of the Fair Labor Standards Act, as amended ("FLSA," 29 U.S.C. § 201 *et seq.*) and the Illinois Minimum Wage Act ("Minimum Wage Law" 820 ILCS 105/1) by failing to pay its Drivers at least the minimum wage required by Federal and Illinois law for every hour worked.

## PARTIES

10.     Mr. Mahwikizi is a resident of Cook County, Illinois. Between October 2015 and February 2022, Plaintiff worked for Uber as a driver in the Chicago, Illinois area.

11.     Defendant Uber is a corporation, organized under the laws of the state of Delaware, which is licensed to conduct business in the state of Illinois, and which does conduct substantial business on a regular and continuous basis in Illinois. Uber's principal place of business is in San Francisco, California.

## JURISDICTION AND VENUE

6.     This Court has federal question jurisdiction over Plaintiff's FLSA claims pursuant to 28 U.S.C. § 1331.   This Court has supplemental jurisdiction over Mr. Mahwikizi's State law claims under 28. U.S.C. section 1367

7.     Venue is proper in the United States District Court, Northern District of Illinois, pursuant to 28 U.S.C. § 1391. Plaintiff resides in Homewood, Illinois, worked for Defendant in Cook County, and his claims arose, in substantial part, in Cook County, Illinois. Defendant regularly conducts business in Cook County, Illinois and is thus subject to personal jurisdiction in this district.

## ALLEGATIONS REGARDING DEFENDANT'S BUSINESS PRACTICES

8.     Defendant Uber is a transportation business, and a common carrier. Through a mobile phone software application, Uber facilitates, controls, and oversees travelers who seek transportation via automobile with drivers, like Plaintiff, who have been screened, trained, controlled, and are paid by Uber.

9.      All Uber drivers must abide by all of Uber's uniform rules, regulations, and policies.

10.     All transportation services provided by Uber to customers are insured by Uber.

11.     Uber's customers who wish to receive transportation services log on to a mobile phone application and enter information regarding, among other things, where they wish to be picked up and where they wish to be dropped off. Then Uber collects payment from Customer. The next step, Uber sends the customer's trip information to the nearest driver with the highest rating.

12.     The Uber driver, with easily identifiable decals provided by Uber which, pursuant to Uber's uniform rules, must be affixed to the front and back windows of every driver's vehicle, then picks up the customer and transports the customer to the desired destination.

13.     Each Uber customer pays for the service by paying Uber directly via credit card based on an amount calculated solely by Uber and based on the miles driven and the amount of time it took to reach the destination, plus any gratuity which the customer wishes to give to the driver.

14.     All payments from the customer, including gratuities, must be paid by the customer directly to Uber. Uber rules do not permit its drivers to accept any type of payment from its customers. Instead, Uber pays each of its drivers a portion of the amount received from the customer (i.e., a portion of the charge for the service and a portion of any gratuity), as determined solely by Uber.

15.     In an effort to avoid providing its drivers with the minimum benefits and protections afforded employees under the FLSA and Illinois law, Uber has willfully, uniformly, and unilaterally classified each and every one of its drivers as independent contractors, rather than employees, despite the fact that the factual circumstances of the relationship between Uber and its drivers clearly demonstrate that Uber drivers are in fact employees of the company.

16.     During the Covid-19 draconian restrictions, prior to the 2021 CDC's Federal Transportation Mask Mandate, and after — Uber instituted rules that required all individuals in a car ride to wear cloth masks above the nose at all times during the trip. This means from before a customer(s) enters in the car until a customer(s) exits the car.

17.     Uber additionally added a reporting mechanism that asked both drivers, and riders if the corresponding counterparts (driver/rider) had worn the mask at all times during the trip.

18.     These rules by Uber, were above and beyond what was generally accepted in the transportation industry before, and after the 2021 CDC Federal Transportation Mask Mandate. For example; The airline industry made accommodations for airline passengers who were eating, or drinking.

19.     Uber made no such concessions.   Uber required Drivers, and Riders to have masks on at all times during a ride, or face the risk that the driver (if you are a rider), or the rider (if you are a driver) could report you for not wearing a mask no matter how accurate this may be.

20.     If a counter-party (Driver/rider) was of the opinion that their counterpart had worn the mask a little below the nose, that would result into a note on the questionnaire you get after the ride.  If a driver or rider had a medical condition that required them to eat, or drink during a ride; they would be reported for non-mask wearing violations.

21.     Once Uber received that report of non-mask violation; Uber would notify the driver, or rider reported. If the Driver/Rider disputed the report, and asked for a forum to clear their name; Uber would respond that they were just notifying them, not accusing them, and that they are aware that these report are often erroneously made and rider/ driver should not be worried about it, and that the violation would not count towards their rating.

22.     These assurance from Uber lead drivers, and riders to believe that the erroneous report of non-mask wearing would be disregarded by Uber, given their assurances, and given they refused to allow the reported party to submit an official dispute directly through a process Uber would have created to arbitrate these matters. Uber never created such a process other than the preliminary conversation with Uber support.

23.     These specific promises amplified the general promises contained in Uber's PAA which never listed any written reference to a non-mask wearing violation policy.

24.     California Courts have held vaguer and more open-ended statements than those Uber made to Mahwikizi sufficiently definite to support a promissory estoppel claim. See Garcia v. World Say FSB, 183 Cal, App, 4th 1031, 1045-46, 107 Cal, Rptr. 3d 683, 696 (2010) (surveying cases where courts found various statements to be sufficiently

definite, including a "promise to use 'best efforts to acquire land sufficient to support promissory estoppel" and "borrowers promise that 'if' he obtained earthquake insurance, lender would be loss payee').

25. Further, Uber had specific knowledge of Mr. Mahwikizi's driving history, and did not provide a forum for a hearing or investigation when Mahwikizi disputed the same violations it promised would not matter, and yet used to validate their suspension of Mahwikizi off the Uber App. Instead, Uber enticed Mr. Mahwikizi to continue driving and using their transportation service.

26. Mr. Mahwikizi relied on Uber's promises and assurances by Uber to continue to use the platform.

27. Mr. Mahwikizi's reliance was reasonable and foreseeable.

28. Mr. Mahwikizi was injured by his reliance on Uber's promises by continuing to drive for Uber, and making Uber profits.

29. Uber continued to make profits off Mr. Mahwikizi's driving activity on Uber even after several non-mask wearing violation reports. If Uber were to suspend Mahwikizi after numerous reports, only to suspend Mahwikizi at a much later time based on the same reports, Uber would have justly enriched itself. Any profits traceable to Mr. Mahwikizi's driving for Uber are a benefit conferred on Uber that it should not have received.

30.     Sadly, Drivers, and riders would come to learn that Uber used an arbitrary process to decide who was in violation of the company's non-mask wearing policy and deserved to be suspended from their driving, or riding privileges.

31.     Public reports through social media, and Mahwikizi's own experiences have shown that Uber had suspended riders, and drivers after the 1st report, 2nd report, 3rd report, and on and on.  There was no concrete threshold at which Uber informed drivers, or riders when it would reach a suspension trigger based on reported non-mask wearing violations.

32.     This random, arbitrary action by Uber towards its drivers, and its riders was capricious, and resulted in many missed hospital visits by riders, and monetary loss by drivers who were all blindsided by Uber's actions.

33.     Uber's suspensions from the App were sudden, unannounced, and came without providing drivers, or riders, the opportunity to have a hearing by decision makers at Uber.

34.     Additionally, Uber asserts that Drivers are free to accept or refuse a rider once they meet the rider for any reason. However, when a rider gets into a car with a driver, the rider accepts to be driven.  If the rider is not comfortable for any reason, the rider has a choice to ask the driver to stop the car, and the rider can get out of the car.

35.     In instances where a rider accepted to be driven to their final destination, they were consummating the contract.  When Uber provided a questionnaire at the end of the ride asking if a driver wore a mask the whole time; Uber was committing a tortious interference with contractual relations.

36.    In instances where a driver accepted to drive some party to their final destination, they were consummating the contract.  When Uber provided a questionnaire at the end of the ride asking if a rider wore a mask the whole time; Uber was committing a tortious interference with contractual relations.

37.    Mahwikizi asserts that the above exact scenarios happened to him directly.

38.    Mahwikizi has a health condition that requires him to keep his blood sugars at a certain level.   During trips, especially long trips — Mahwikizi has to drink, or eat throughout the trip.

39.    Uber did not provide an allowance in its rules for eating, and/or drinking during rides.

40.    When Mahwikizi did such actions during trips; riders would have reported him for non-mask wearing violations.  Riders indeed took such actions.

41.    When Mahwikizi would receive non-mask wearing violation reports; Mahwikizi would immediately contact Uber Support to dispute such claims.  Sometimes, the report directly came from riders on a disgruntled basis, of riders could mistakenly click the non-mask wearing circle in the questionnaire by mistake instead of another choice given the questionnaire offered multiple choices for the rider/driver after a trip to rate each other.

42.    On or About February 14th, 2022 — Mahwikizi received a notice on the App that informed him that a committee had conducted a company side review and his account had been suspended for non-mask wearing violations.

43.    When Mahwikizi contacted Uber support for more information and to dispute the action taken by Uber; Mahwikizi was rebuffed, and told that the decision was final.

44.    Mahwikizi then wrote to the company's headquarters, and their Chief Executive Officer asking for an answer to his dispute of Uber's account suspensions within 30 days.

45.    A few weeks later, Uber's Brian Kubiak, a senior paralegal, responded to Mahwikizi's letter via email informing Mahwikizi that Uber stood by its suspension decision. Uber provided no context other than to confirm on a phone conference between Mahwikizi & Uber's Kubiak that Uber had received 20 non-mask wearing between 2020-2022.

46.    Mahwikizi has been a rider share driver since October 2015.

47.    Between October 2015 and 2022; Mahwikizi has driven over 30 thousand rides.

48.    Over 7 years; That would be an average of 4,285 rides a year

49.    This would have seen Mahwikizi drive at least 8,570 rides between 2020 and 2022

50.    Uber's Brian Kubiak's reported 20 non-mask wearing violations in 2 years would mean Mahwikizi received derogatory reports for not wearing a mask on 0.23% of the rides Mahwikizi gave between 2020, and 2022.

51.    Additionally, For all the reported violations that Mahwikizi received a notification for on his App, Mahwikizi responded disputing them, or asking for an audience with Uber decision makers to discuss what Drivers can do if they receive a malicious report from riders who purposely reported non-mask wearing in order to

receive an incentive from Uber which usually is a free ride.

52.     At each instance, Uber responded by letting Mahwikizi know that the report did not mean an accusation from Uber, and that they understood the types of circumstances where a rider could make an erroneous report.  Each message from Uber began or ended with an appreciation of Mahwikizi's high rating of 5.0 and driving history with Uber.

53.     Uber's Community Guidelines states the following: "If you have more than one Uber account, such as a rider account and a driver account, violating the Community Guidelines could also lead you to lose access to all Uber accounts. If you believe an error caused you to lose access to your account, you may contact the Uber Support team."

54.     Uber is a common carrier within the meaning of the legal definition of the Law governing Common Carriers.

55.     The current longest-serving member of the United States Supreme Court, Justice Clarence Thomas, recently observed that "our legal system and  its British predecessor have long subjected certain businesses, known as common carriers, to special regulations, including a general requirement to serve all comers." Biden, 141 S. Ct. at 122 (Thomas, J. concurring).

56.     Uber's home State of California has such a law. In 1872, California enacted a law defining the duties and obligations of common carriers.  Relevant here, under the statute, "[e]very one who offers to the public to carry persons, property, or messages, is a common carrier of whatever he thus offers to carry." Cal. Civ. Code section 2168 (emphasis added).  Notably, nothing in the text of section 2168 requires that a company have market power to be considered a common carrier.

57. The California courts have applied this law to technologies that did not exist in 1872, finding that telephone and taxicab companies are common carriers. See, e.g. Berea V. Associated Oil Co., 117 Cal. App. 139, 143, 3 P.2d 622, 623 (1931) ("The answer of the cab company, by failure to deny, admits that it was engaged in the business of carrying passengers for hire. This admission would seem to bring the cab company within the definition of a common carrier found in section 2168 of the civil code.")

58. As the California Supreme Court has explained, "section 2168 defines a 'common carrier' carrier in expansive terms." Gomez v. Superior Ct., 35 Cal. 4th 1125, 1130, 113 P.3D 41, 44 (2005) The Gomez court noted California's "broad" concept of common carrier principles such as "carrier of persons for reward".

59. Uber's services fit within section 2168's definition of a "common Carrier". Uber holds itself out to the public as an entity willing to carry goods, and passengers. In this regard, by the company's own admission, Uber's Platform is capable of delivering millions of goods, and passengers every day.

60. California Courts have applied section 2168 to Uber.

61. In one case, this Court rejected Uber's argument "that it is not a common carrier but that it is a 'broker' of transportation services,' Doe v Uber Techs., Inc., 184 F. Supp. 3d 774, 786 (N.D. Cal. 2016), holding that the plaintiff had plausibly alleged "that Uber is a common carrier" under section 2168, id. at 787.

62. In another case, A California court rejected Uber's argument "that it is not a common carrier because of conditions that are placed on who can use and be connected with drivers via the app." Doe v. Uber Techs., Inc., No. 19-CV-03310-JSC, 2019 WL

6251189, at *6 (N.D. Cal. Nov. 22, 2019). The Court noted "[c]ommon carrier liability can attach even for transportation services that are of possible use to only a fraction of the population." id. (internal quotation marks omitted). "In sum, Uber's status as an app-based transportation network does not preclude it as a matter of law from being held liable as a common carrier." Id

63.    Under California law, common carriers like Uber "must, if able to do so, accept and carry whatever is offered to him, at a reasonable time and place, of a kind that he undertakes or is accustomed to carry." Cal Civ Code section 2169. In other words since it is a common carrie under California law, Uber must "service all comers." Biden, 141 S. Ct at 1222 (Thomas, J., concurring).

64.    California Law confirms that a common carrier's right to refuse service is narrow. In People v. Trophy, 49 Cal. App. 2d 15, 120 p.2d 946 (1942), which involved the use of telephone services in connection with a bookmaking operation, the court stated that "common carriers are not the censor of public or private morals." 49 Cal. App. 2d at 33. As the Trophy court put it, a "telephone company has no more right to refuse its facilities to persons because of a belief that such persons will use such service to transmit information that enable recipients thereof to violate the law than a railroad company would have to refuse to carry persons on its trains because those in charge of the train believed that the purpose of the persons so transported in going to a certain point was to commit an offense." Id., cf. Mason v. Western Union Telegraph C., 52 Cal. App. 3d 429, 439, 125 Cal. Rptr. 53, 58 (1975) ("We conclude that Western Union has no right of censorship except in the specific instances enumerated in Public Utilities

Code section 7904 which instances do not include the right to refuse to transmit telegrams which may allegedly be libelous.").  If common carriers cannot bar even libelous material certainly speech on whether a driver agrees to pick up a passenger or not, or speech where a rider/driver need to protect the immediate risk to their health due to a health disability by taking a mask down to breathe better, drink, or eat to maintain blood sugar levels does not fall within such a carrier's narrow right to exclude.  Of Course, this case involves the narrow issue of Uber's right to exclude Mahwikizi as a driver, and a rider, as well as people who are similarly situated to Mahwikizi's position as a rider, and a driver.

65.    Extending section 2168 to Uber would not violate Uber's First Amendment either because Uber's principal business is a common carrier within the transportation services industry.

66.    Uber provides primary liability coverage for drivers from the moment they are matched with a rider until the rider is dropped off.  Their auto liability insurance will apply as primary to a driver's standard personal automobile insurance policy.

67.    Uber acts as a principal by controlling the transportation service provided to the driver/rider. Uber control;ed the actions of the driver, and rider as it came to mask wearing with power to fire with driver, or suspend rider for 3rd party reports without providing a forum for dispute resolution.  Uber has a greater control of booking rides, pricing, collection of funds, and provision of service than a railway company, or an airline company do.

68.    Uber utilizes a wholly owned captive insurance subsidiary and 3rd party

insurance which may include deductibles and self-insured retentions, to insure or reinsure costs, including auto-liability, uninsured, and under-insured motorists, auto physical damage, 1st party injury coverages including personal injury retention under State law, and general liabilities up to a certain limits.

69.     Uber derives substantially (95%) all of the company's revenue is generated from its ride-sharing business and the revenue is recognized in accordance with Accounting Standards codification topic 606 ("ASC 606").  Of this Revenue Uber garners over 65% of it from Airport traffic business.

70.     Uber's source of the majority of its revenues come from contracts with businesses engaged in interstate commerce.  Uber has contracts with governments, and businesses engaged in interstate commerce to provide a geofenced staging area for their drivers for the sole purpose of only providing airport departing passengers to only those drivers in that geofenced staging area. Many passengers go from the airport to out of state destinations, interstate train stations, and international embassies, or general consulates.

71.     Mahwikizi lost both his access to his driver account, and rider account.  The only recourse Uber provides for users of their transportation platform is to contact Uber Support team.

72.     Uber's suspension of drivers, and riders because of non-mask wearing reported violations between 2020 and 2022 affected over 25 million users nationwide.

73.     Uber's suspension of drivers in Illinois affected over 40 thousand drivers

74.     The controversy has reached a level of public status given the wide, broad

amount of people who were kicked off an App that is akin to a public transportation service.

75.     Uber's Community Guidelines were last modified on 10/2/2021

76.     Uber's controlling Platform Access Agreement (PAA) is dated January 1, 2022

77.     Uber's PAA does not mention mask wearing policies anywhere in the agreement.

78.     Uber's PAA doe not mention the method of investigation, any hearings afforded to drivers, or riders before adverse decisions against their account.

79.     Uber's PAA refers to a hyperlink in the contract that alludes to Uber's "Community Guidelines".  However the PAA itself, doesn't list any of those guidelines in the PAA agreement.

80.     Mahwikizi received a prompt to agree with Uber's PAA in the middle of his working day, between rides, in Chicago traffic.

81.     Mahwikizi's reading of Uber's PAA did not point to anything regarding mask-wearing, and therefore could not have had a chance to send an inquiry to Uber about any potential concession on his behalf due to his medical disability. The only recourse he would have had to address the matter if it specifically came up from Uber support would have been when he received a reported violation specifically referring to any action relating to his disability.

82.    Uber's failure to address any mask wearing policy explicitly in Uber's PAA, or Uber's community guidelines renders the company's decision to permanently suspend Mahwikizi from the Uber App a breach of contract that resulted in a large economic loss for Mahwikizi and other similarly situated drivers.

83.    Uber's failure to address any mask wearing policy explicitly in Uber's PAA, or Uber's community guidelines renders the company's decision to permanently suspend Mahwikizi from the Uber App a breach of contract that deprives riders such as Mahwikizi, and other similarly situated riders of riding privileges to important destinations like Hospitals, Police headquarters, Schools, and voting polls.

84.    Under the FLSA and Illinois law, Uber drivers should be considered employees for, among others, the following reasons:

a.  Uber retains the right to control, and in fact does control, the manner and means by which all Uber drivers accomplish their work;

b.  Between 2020-2022 — Uber placed drivers under full control of the rides given. From providing insurance of the ride from beginning to end, to requiring drivers mask up during the whole trip, without eating, or drinking.

c.  Uber retains the right to hire and fire drivers in its sole discretion;

c.  Uber retains the right to terminate the Uber "Platform" and the Uber application, or to block drivers from using the Platform and/or application, which effectively gives Uber the ability to prevent its drivers from picking up Riders, working, and earning an income;

d. Uber takes a 20% "administration fee" from each driver's gratuities left by the customer for the driver;

e. Drivers do not engage in business distinct from that of Uber;

f. Without Drivers, Uber's business would be defunct, and Uber's stock price's intrinsic value would be zero today.

g. Uber requires that each driver place a large Uber sign on the front of their car while transporting a Rider to identify the driver's car as a Uber vehicle;

h. Uber sets all rates of pay for its drivers and prohibits its drivers from setting rates of pay for their services;

i. Uber requires drivers to refuse receiving any cash tips/gratuities.

j. Uber encourages riders to not give any cash tips/gratuities to drivers.

k. Uber requires its drivers to consent to receiving emails and text messages from Uber, all of which the drivers are required to pay for receiving at the rate charged by their mobile phone service providers, including without limitation, notification emails, emails or text messages informing drivers about potential available Riders, and emails or text messages regarding Uber promotions which drivers are required to abide by;

i. Uber unilaterally and in its sole discretion requires each driver to accept any and all discount promotion offers to customers;

j.  Uber requires each driver to engage in a two hour training session before being permitted to work as a Uber driver, including the viewing of training videos, which, inter alia, instructs drivers regarding Uber's requirements for how they are to interact with Riders;

k.  Uber requires that each driver ensure that his or her vehicle comply with Uber's requirements for appearance and cleanliness;

l.  Uber retains the right to discipline its drivers in its sole discretion;

m.  Uber notifies drivers that they are on the route provided, or if they have gone over trip time.

n.  Uber advertises that its drivers receive an hourly rate of pay;

o.  Uber restricts its drivers ability to work and earn income by only permitting them to work certain hours each day;

p.  Uber prohibits its drivers from hiring other employees to assist them; and,

q.  Uber requires its drivers to respond to and accept all customer ride requests unless they are transporting another customer at the time.

85.     Between 2020-2022 - Uber required drivers to have a mask on at all times without the ability to drink, or eat.  If a driver drank, or ate, a rider could report them for violation of mask wearing policy. When disputed by driver, Uber did not investigate further, but held the violation against driver anyway.

86.     This policy exerted full control on drivers without any national, or IL State Law in place like the seatbelt laws.  This policy was stricter than the mask policy airlines had instituted where there was an allowance for eating/drinking, without any tortious

interference with contractual relations between the Driver and the Rider. This amount of control taken by Uber, and the fact that Uber has always insured all rides whether they were intra-state, or inter-state provides a foundation to hold Uber as an employer, and drivers as employees. Currently Uber misclassifies drivers as independent contractors.

87. Mahwikizi's disability was impacted by Uber's mask wearing policy, and any action that Uber took was a violation of Mahwikizi's rights under the American Disabilities Act, especially when Uber did not explicitly provide a platform for drivers with disabilities to raise these issues.

88. As a result of Uber's uniform misclassification of its drivers as independent contractors, Uber does not pay its drivers a minimum wage for each hour, or portion thereof, that they work. Instead, Uber pays its drivers using a formula, derived and determined solely by Uber, based on and related in some way to the amount Uber receives from its customers. The consequences of this practice are, without limitation, that Uber drivers: (1) are not paid for all of the hours that they actually work; and (2) are not paid at least the minimum wage required by Federal law for each hour worked.

89. Further, Defendant denied riders the ability to see what riders paid in total and how the compensation for the ride was determined. Compensation is determined, and was visible, solely by Uber. For example, on a trip Mahwikizi gave in December 2021 — Rider showed Mahwikizi that they were charged $68; however Mahwikizi received only $23 for that trip.

90. Mahwikizi provided trips in the Chicagoland area from 2015 to 2022.

91. Mahwikizi provided foreign, and interstate trips during this time including:

A.     A roundtrip trip from O'Hare Airport to Quad City Iowa, then from Quad City Iowa back to an O'Hare Airport area Hotel.

B.  A trip from Harvey, IL to Fort Wayne Indiana

C.  A trip from Chicago, IL to Geneva, Wisconsin

D.  A trip from Orland Park, IL to Racine, Wisconsin

E.  Mahwikizi spends several days a week providing service strictly in Northwest Indiana. Up to 12 hours a week where the rider originates in Indiana, and ends the trip in Indiana.

F.  Mahwikizi, and Uber drivers routinely and frequently provide trips from airports to the compound of foreign embassies, and consulate general offices. Such trips can be legally classified as foreign trips that crosses borders given embassies, and consulate general offices are under the control of foreign governments.

92.    Mahwikizi meets the definition of being "engaged in the business" of inter-state commerce. 18 USC § 921(a)(21).

## **COLLECTIVE ACTION ALLEGATIONS**

93.     Plaintiff brings this action on behalf of herself and on behalf of all other persons similarly situated (the "Class"), namely drivers, who, at any time during the period from October 13, 2015, to February 11th, 2022 (the "Class Period"), have worked, or currently work, as a driver for Uber.

94.     Plaintiff is and has been a member of the proposed Class described herein.

95.     The number of persons in the proposed Class herein is so numerous that joinder of all such persons would be impracticable.  While the exact number and identities of all such persons are unknown to Plaintiff at this time and can only be obtained through appropriate discovery, Plaintiff is informed and believes, and on that basis alleges, that the proposed Class herein includes over 1,000 persons.

96.     Disposition of Plaintiff's claims in a collective action will benefit all parties and the Court.

97.     There is a well-defined community of interest presented by the proposed Class herein in that, among other things, each member of the proposed Class has an interest in receiving the minimum compensation required by the FLSA for the hours they have worked for Defendant, obtaining other appropriate legal relief for the harm of which Plaintiff complains, and obtaining other adequate compensation for the common damages which Plaintiff and all other persons similarly situated have suffered as a result of Defendant's actions.

98.     Each Class Member herein has performed labor for Defendant at Defendant's request at some time during the Class Period for which they have not been properly compensated, in that they have not received the minimum compensation required by the FLSA.

99.     A collective action in this case is superior to any other available method for the fair and efficient adjudication of the claims presented herein.

100.    The prosecution of separate actions by individual members of the proposed Class herein would create a risk of inconsistent and/or varying adjudications with respect to individual members of the proposed Class which would or may establish incompatible standards of conduct for Defendant and which would also create a risk of adjudications with respect to individual members of the proposed Class herein which would, as a practical matter, be dispositive of the interests of other members of the proposed Class not parties to the particular individual adjudications, and/or would or may substantially impede or impair the ability of those other members to protect their interests.

101.    Common questions of law and fact exist in this case with respect to the proposed Class which predominate over any questions affecting only individual members of the Class and which do not vary between members thereof.

102.    At some time during the Class Period, all of the individuals in the proposed Class herein have been employed by Defendant as drivers and have been unlawfully subjected to a uniform and consistent set of employment practices, as described more fully herein.

103. All members of the proposed Class herein have worked hours during the Class Period, but have been deprived of their legal rights, guaranteed by the FLSA, to be paid a minimum wage for such hours.

104. The common questions of fact involved in this case include, without limitation, whether each member of the proposed Class herein have worked hours during the Class Period for which they have not been paid at least the minimum wage required by Federal law.

105. The common questions of law involved in this case include, without limitation: (1) whether Class Members performed labor for Defendant as employees or as independent contractors; (2) whether Defendant has violated the FLSA by failing to pay its driver employees at least the legally required minimum wage for each and every hour worked; and, (3) whether Plaintiff and those other persons similarly situated are entitled to general and/or special damages as a result of any of the legal violations complained of herein, and the nature of such damages.

106. The claims of the named Plaintiff in this case are typical of those of the other Class Members which he seeks to represent, in that, among other things, Plaintiff and each other Class Member have sustained damages and are facing irreparable harm because of, and arising out of, a common course of conduct engaged in by Defendant as complained of herein.

107. The claims of the named Plaintiff herein are coincident with, and not antagonistic to, the claims of other Class Members which the named Plaintiff seeks to represent.

108. The named Plaintiff herein will fairly and adequately represent and protect the interests of the members of the proposed Class which he seeks to represent. Plaintiff does not have any interests which are antagonistic to the interests of the proposed Class herein.

109. By virtue of Defendant's unlawful failure to pay Class Members the minimum compensation required by Federal law, Defendant has received substantial sums of money, and has realized profits from the unpaid labor of literally hundreds of thousands of employees during the applicable limitations period.

110. At all times relevant hereto, the FLSA was, and continue to be, in full force and effect, and the Defendant herein was, and continues to be, bound thereby.

111. The relief sought in this action is necessary to restore to members of the proposed Class the money and property which Defendant has illegally acquired through the unlawful treatment of each Class Member as described herein.

## FIRST CLAIM FOR RELIEF

## Failure to Pay Minimum Wage in Violation of FLSA

112. Plaintiff re-alleges and incorporates by reference, as though fully set forth herein, paragraphs 1 through 37 of this Complaint

113. Defendant is the employer of Plaintiff.

114. Defendant willfully and uniformly misclassified Plaintiff and the class of Drivers as an independent contractor when in fact she was and/or is an employee of UBER.

115.    The FLSA provides that any employee who receives less than the legal minimum wage applicable to the employee is entitled to recover in a civil action the difference between what the employee was paid and the amount the employee should have been paid, known as back pay, and an equal amount as liquidated damages, plus attorney's fees and court costs.

116.    The FLSA provides that the applicable minimum wage that an employee is entitled to is the higher of the Federal minimum wage and the applicable State minimum wage.

117.    Defendant has failed to pay Plaintiff and the class of Drivers at least the legally required minimum wage for some portion of the hours that each such person worked as a driver for UBER during the preceding three years.

118.    Defendant's failure to pay Plaintiff and the class of Drivers at least the minimum wages, as required by law, violates the provisions of the FLSA.

119.    By virtue of Defendant's unlawful failure to pay minimum wages to Plaintiff and the class of Drivers, they have suffered, and continue to suffer, damages in amounts which are presently unknown to Plaintiff but which will be ascertained according to proof at trial.

120.    Pursuant to the FLSA, Plaintiff and the Class of Drivers are entitled to recover from Defendant the full balance of any and all unpaid minimum wages, plus attorney's fees and court costs.

**WHEREFORE,** Plaintiff and all similarly situated persons who join this collective action demand as follows:

A.　Designation of this action as a collective action on behalf of the Plaintiff and the prospective Class that he seeks to represent;

B.　Prompt issuance of notice pursuant to 29 U.S.C § 216(b) to all similarly situated members of the Class, apprising them of the pendency of this action and permitting them to assert timely claims in this action by filing individual consent to sue forms pursuant to 29 U.S.C. § 216(b);

C.　Equitable tolling of the statute of limitations from the date of the filing of this Complaint until the expiration of the deadline for filing consent to sue forms under 29 U.S.C. § 216(b);

D.　Leave to add additional Plaintiffs by motion, the filing of written consent forms, or any other method approved by this Court.

E.　Judgment against Defendant for an amount equal to Plaintiff's and the Class' unpaid back wages at the applicable statutory minimum wage;

F.　Judgment against Defendant stating that Defendant's violations of the FLSA were willful;

G.　An amount equal to the Plaintiff's minimum wage damages as liquidated damages;

H.　To the extent that liquidated damages are not awarded, an award of prejudgment interest;

I.   A declaration that Defendant's practices as to Plaintiff and the Class were

unlawful, and grant Plaintiff and the Class equitable relief;

K.   For such further relief as this Court deems just and equitable.

## CLASS ACTION ALLEGATIONS

121.   Plaintiff asserts his Rule 23 class claims on behalf of a Putative Class defined as

follows:

**All persons employed by UBER as drivers in Illinois within seven years of the filing of this complaint through the date of final judgment in this action.**

122.   Plaintiff is and has been a member of the Putative Class described herein.

123.   The number of persons in the Putative Class herein is so numerous that joinder of all such persons would be impracticable.  While the exact number and identities of all such persons are unknown to Plaintiff at this time and can only be obtained through appropriate discovery, Plaintiff is informed and believes, and on that basis alleges, that the Putative Class herein includes over 1,000 persons.

124.   Disposition of Plaintiff's claims in a class action will benefit all parties and the Court.

125.   There is a well-defined community of interest presented by the Putative Class herein in that, among other things, each member of the Putative Class has an interest in being classified as an employee rather than an independent contractor, obtaining other appropriate legal relief for the harm of which Plaintiff complains,

and obtaining other adequate compensation for the common damages which Plaintiff and all other persons similarly situated have suffered as a result of Defendant's actions.

126.    Each Class Member herein has performed labor for Defendant at Defendant's request at some time during the Class Period, while the Class was unlawfully misclassified as independent contractors.

127.    A class action in this case is superior to any other available method for the fair and efficient adjudication of the claims presented herein.

128.    The prosecution of separate actions by individual members of the Putative Class herein would create a risk of inconsistent and/or varying adjudications with respect to individual members of the Putative Class which would or may establish incompatible standards of conduct for Defendant and which would also create a risk of adjudications with respect to individual members of the Putative Class herein which would, as a practical matter, be dispositive of the interests of other members of the Putative Class not parties to the particular individual adjudications, and/or would or may substantially impede or impair the ability of those other members to protect their interests.

129.    Common questions of law and fact exist in this case with respect to the Putative Class which predominate over any questions affecting only individual members of the Class and which do not vary between members thereof.

130.    At some time during the Class Period, all of the individuals in the Putative Class herein have been employed by Defendant as drivers and have been unlawfully subjected to a uniform and consistent set of compensation, as described more fully herein.

131.   The common questions of fact involved in this case include, without limitation, whether each member of the proposed Class herein have worked hours during the Class Period for which they have not been paid at least the minimum wage required by Florida law.

132.   The common questions of law involved in this case include, without limitation: (1) whether Class Members performed labor for Defendant as employees or as independent contractors; (2) whether Defendant has violated Illinois Statute by failing to pay its driver employees at least the legally required minimum wage for each and every hour worked; and, (3) whether Plaintiff and those other persons similarly situated are entitled to general and/or special damages as a result of any of the legal violations complained of herein, and the nature of such damages.

133.   The claims of the named Plaintiff in this case are typical of those of the other Class Members which he seeks to represent, in that, among other things, Plaintiff and each other Class Member have sustained damages and are facing irreparable harm because of, and arising out of, a common course of conduct engaged in by Defendant as complained of herein.

134.   The claims of the named Plaintiff herein are coincident with, and not antagonistic to, the claims of other Class Members which the named Plaintiff seeks to represent.

135.   The named Plaintiff herein will fairly and adequately represent and protect the interests of the members of the Putative Class which he seeks to represent.  Plaintiff does not have any interests which are antagonistic to the interests of the Putative Class herein.

136.    The relief sought in this action is necessary to restore to members of the Putative Class the money and property which Defendant has illegally acquired through the unlawful treatment of each Class Member as described herein.

137.    Plaintiff intends to send notice to all members of the Putative Class to the extent required by Fed. R. Civ. P. 23. The names and addresses of the Putative Class members are available from Defendant's records.

## SECOND CLAIM FOR RELIEF (AS TO CLASS ACTION)

### Violations of Illinois Minimum Wage Act

138.    Plaintiff re-alleges and incorporates by reference, as though fully set forth herein, the above paragraphs of this Complaint.

139.    Plaintiff and the Class of Drivers has exhausted all of his administrative and pre-suit requirements. Specifically, Plaintiff and the Class of Drivers have notified Defendants of the deficiency in his wages, and unfair suspension in writing.

140.    During the statutory period, Defendants did not pay Plaintiff and the Class of Drivers the applicable Illinois minimum wage, as Defendants was required to do.

141.    As a result of the foregoing, Plaintiff has suffered damages.

**WHEREFORE,** Plaintiff and all similarly situated persons who join this collective action demand as follows:

    A.    Designation of this action as a class on behalf of the Plaintiff and the prospective Class that he seeks to represent;

    B.    Judgment against Defendant for an amount equal to Plaintiff's and the Class' unpaid back wages at the applicable Illinois minimum wage for the class period;

    C.    Judgment against Defendant stating that Defendant's violations of the Illinois Minimum Wage Act were willful;

    D.    An amount equal to the Plaintiff's minimum wage damages as liquidated damages;

    E.    To the extent that liquidated damages are not awarded, an award of prejudgment interest;

    F.    A declaration that Defendant's practices as to Plaintiff and the Class were unlawful, and grant Plaintiff and the Class equitable relief;

    H.    For such further relief as this Court deems just and equitable.

**COUNT III**
**UNJUST ENRICHMENT**

142. Mr. Mahwikizi re-alleges the preceding paragraphs herein.

143. Uber claims that it suspended Mr. Mahwikizi for repeatedly violating the platform's mask-wearing rules.

144. According to Uber, for at least a certain time period, Mr. Mahwikizi used Uber in violation of the company's alleged policies, although that policy does not exist in Uber's PAA, nor in its community guidelines.

145. Uber profited in the process by making profits while, allegedly Mr. Mahwikizi was in violation

146. Any profit traceable to Mr. Mahwikizi's work as a driver are a benefit conferred on Uber that it should not have received.

147. Mr. Mahwikizi is entitled to restitution from Uber

**COUNT IV**
**PROMISSORY ESTOPPEL**

148. Mr. Mahwikizi re-alleges the preceding paragraphs herein.

149. Uber made unambiguous, promises and assurances to Mr. Mahwikizi over the course of 2 years, including but not limited to the following:

150. "We [Uber] would also like to inform you that no action would be taken against you based on this report"

151. "We [Uber] have noticed that you ha lot of good feedback here. We appreciate you for continuing to do what you are best at."

152. "Also, completing 11,583 trips is no small feat, so we thank you for every single one of them. Taking a look at the feedback provided by your passengers, it is clear that your riders enjoy taking trips with you."

153. "Your star rating should not be negatively impacted by things out of your control. As part of Ratings Protection, low ratings will not impact your rating."

154. "We understand that there are users who exhibit inappropriate behavior and make false allegations, however, we appreciate your professionalism in handling difficult situations like this."

155. "At this time, no further action will be taken with regard to your account status or ability to use the app.  You are a wonderful driver to the Uber team. We truly admire your hard work in providing extraordinary service to our riders.  Thanks again for taking time to share this additional information with us."

156. These specific promises amplified the general promises contained in the PAA under which Uber purported to allow drivers to be independent contractors who could choose who to give a ride to or not.  When erroneous reports came from riders; Uber promises to leave that decision to the Driver and offer a support team to try to resolve the issues.

157. Further, for 2 years, Uber had specific knowledge of Mr. Mahwikizi's activity driving for them, and any issues that Mr. Mahwikizi worked with the Uber support team on, including mask-wearing report.  Uber did not suspend Mr.

Mahwikizi in 2020, or 2021 due to any of these reports.  In fact, Uber enticed Mr. Mahwikizi to continue doing the good job he was doing based on the overall feedback his account was getting, high ride numbers, and a 5.0/5/0 rating.

158.   Mr. Mahwikizi relied on Uber's promises and assurances by continuing to be part of the intra-state, and inter-state transportation chain for goods, and passengers.

159.   Mr. Mahwikizi's reliance was reasonable and foreseeable.

160.   Mr. Mahwikizi was injured by his reliance, and by continuing to build a great track record on Uber's platform.

## COUNT V
## BREACH OF CONTRACT

161.   Mr. Mahwikizi re-alleges the preceding paragraphs herein.

162.   The terms and Uber's rules, which do not include any mask-wearing policy in the PAA, or the Community Guidelines, constitute a binding contract between Uber, and Mr. Mahwikizi.

163.   The contract between Uber, and Mr. Mahwikizi is a contract of adhesion under California Law.

164.   Since Uber is the drafter of the terms of the contract between it and Mr. Mahwikizi, the terms should be construed against the company.

165.   Uber amended its terms on January 1, 2022. No mention of a mask wearing policy existed in the new terms.

166. Uber's terms did not commit the company to a specific mask-wearing policy. The company is bound to apply that policy objectively and rationally under California's duty of good faith and fair dealing which requires, among other things, "each contracting party to refrain from doingg anything to injure the right of the other to receive the benefits of the agreement." Egan v. Mut of Omaha Ins. Co., 24 Cal. 3d 809, 818, 620 P.2d 141 (1979).

167. As set forth above, the conduct claimed as reason for suspension did not violate any of Uber's rules as defined in Uber's PAA, of Community Guidelines, including the reassurances received from the Company by Mr. Mahwikizi which he relied upon to continue working for Uber.

168. Uber breached its contract with Mr. Mahwikizi by permanently suspending his account on the basis that he violated the company's Covid-19 rules. Additionally Uber suspended Mr. Mahwikizi's rider account. Between 2020-2022, Uber suspended accounts on the same basis to at least 3 million riders, and drivers who currently cannot use the app to travel, including any ride credits they had earned from spending money with Uber.

169. Mr. Mahwikizi incurred damages on account of Uber's break of contract

170. Uber's breach of contract was intentional and willful.

171. Since Uber is a common carrier and its actions against Mr. Mahwikizi were at least willful, the liability waiver, class waiver, and arbitration clauses the company unilaterally included n its Terms is unenforceable since a "common carrier cannot be exonerated, by an agreement made in anticipation thereof, from

liability for the gross negligence, fraud, or willful wrong of himself or his servants." Cal. Civ. Code Section 2175.

## COUNT VI
## VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW
### Cal. Bus. & Professions Code Section 17200 et seq.

172. Mr. Mahwikizi re-alleges the preceding paragraphs herein.

173. The California Unfair Competition Law (the "UCL') prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [California's False Advertising Law]." Cal. Bus. & Prof. Code section 17200.

174. At a minimum, the following actions by Uber against Mr. Mahwikizi were unfair, deceptive, and untrue with respect to Mr. Mahwikizi:

175. The statement that Mr. Mahwikizi committed "repeated violations" of Uber's mask wearing policy when Uber had already advised they had disregarded the violations Mr. Mahwikizi approached them on in order to discuss the dispute Mr. Mahwikizi had. Uber advised Mr. Mahwikizi that they would disregard reports, and would not affect his rating. Uber then turned around and used these same reports to justify a suspension without a hearing or conversation with Mr. Mahwikizi.

176. Uber advertised that the company's objective was to be the arbiter of health for the community, and imposed a draconian mask wearing policy that was immediately abused users, and the company itself. Worst, Uber denied the right

of drivers and riders to take mask off to eat, drink, or simply cure mask induced labored breathing which violated Mr. Mahwikizi's health disabilities, and induced many erroneous mask-wearing reports.

177. "An unlawful business practice under [UCL] section 17200 is 'an act or practice, committed pursuant to business activity, that is at the same time forbidden by law." Haley v. Sharp Healthcare, 183 Cal. App. 4th 1373, 1383, 108 Cal. Raptor. 3d 669, 677 (2010) Provided the conduct at issue "is at the time forbidden by law", then "virtually any law, Federal, state, or local, can serve as a predicate for an action under" the UCL. id.

178. To have standing under the UCL, a plaintiff must '(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e. economic injury, and (2) show that the economic injury was the result of, i.e. caused by, the unfair business practice or false advertising that is the gravamen of the claim." Kwikset Corp. v. Superior Ct., 51 Cal. 4th 310, 322, 246, P.3d 877, 885 (2011).

179. At a minimum, Uber's refusal to carry Mr. Mahwikizi as a rider, or allow him to continue driving is a violation of the California common carrier law. Mr. Mahwikizi has suffered a specific economic injury on account of Uber's violation of that statute, including but not limited to an account of not being able to drive on the Uber app when Mr. Mahwikizi was part of the most highest rated cohort of veteran drivers on the platform. Uber suspended Mr. Mahwikizi based on 0.23% of all the rides given between 2020, and 2022. That means 99.78% of positive

rides do not matter to Uber, and Uber's Board of Directors.

**COUNT V**
**VIOLATION OF CALIFORNIA COMMON CARRIER LAW**
**Cal. Civ. Code. Sections 2168, 2169, 2209**

180.   Mr. Mahwikizi re-alleges the preceding paragraphs herein.

181.   Under California Law, "everyone who offers to the public to carry persons, property, or messages, excepting only telegraphic messages, is a common carrier of whatever he this offers to carry" Cal. Civ. Code. Section 2168.  In California, a "common carrier must, if able to do so, accept and carry whatever is offered to him, at a reasonable time and place, of a kind that he undertakes or is accustomed to carry.," Id. Section 2169

182.   Further, "every person whose message is refused or postponed, contrary to the provisions of this Chapter, is entitled to recover from the carrier his actual damages, and fifty dollars in addition thereto." id section 2169

183.   Uber offers to the public to carry packages (including messages in the form of letters, and passengers (including passengers carrying a verbal message), on its platform

184.   Uber is not a telegraphic message service.

185.   Uber's Terms provide that "The State of California, excluding its choice of law provisions, will govern…any dispute that arises" between a user and at the company.

186.   Uber has refused, and currently refuses to allow Mr. Mahwikizi's rider account, and driver account to be active, missing hundreds of dollars a day in lost revenue

on account of a mask wearing policy that has been stuck down as unconstitutional in a Florida Federal Court.

187. Mr. Mahwikizi has incurred damages by Uber's refusal, including but not limited to not being able to earn while driving passengers, and missing the potential gratuities that is well known to increase in the summer due to increased travel in Chicagoland area.

188. Requiring Uber to allow back any driver, or rider that was suspended on account of Uber's ill-advised mask wearing policy that did not make an allowance for taking a mask off due to mask-induced labored breathing, or shortness of breath, or to eat and drink to maintain one's blood sugar levels would not violate Uber's 1st amendment rights. Mr. Mahwikizi did not violate Uber's terms according to the January 1, 2022 PAA, or Uber's Community Guidelines. As a result, application of section 2168 to Uber would not require the company to take action that would violate its policies. Especially given the mask-wearing was rules unconstitutional.

## COUNT VI
## TORTIOUS INTERFERENCE WITH CONTRACTUAL AND/OR ADVANTAGEOUS RELATIONS

189.  Mr. Mahwikizi re-alleges the preceding paragraphs herein.

190.  Uber's conduct, as set forth above, in requiring drivers, and riders report on each other for mask-wearing, and allow for denying a ride to someone in need because a child could not keep a mask on amounted to Uber's unlawful tortious interference with the contracual and/or advantageous relationship that exists between a driver, and the 3rd party customer.

191.  When a rider gets into a car, Uber has already taken her money, and she is under the impression that the contract has been consumated.  For drivers or riders to cancel a ride because of an arbitray rule breaks a contract that was, at the point of customer getting into the car, a consumated contract.

192.  Uber knows about the contract, given they are the orchestrator of the contract. Pushing for riders, and drivers to break such contracts after the booking creates lost revenue for driver, and potentially worst damages if the rider becomes late to her appointment, of god forbid needs to go to the emergency room.

193.  The intentional acts of Uber's so called mask-wearing policy were designed to cause a breach of the contractual relationship between rider, and driver.

194.  An actual breach or disruption of the contractual relationship occurred.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Mahwikizi respectfully prays that this Court:

A. Enter an injunction requiring Uber to comply with California's common carrier statute, the UCL, its contractual obligations, and the promises the company made to Mr. Mahwikizi by requiring Uber to lift the suspension of Mr. Mahwikizi driver, and rider accounts, as well as those who are similarly situated and lost access to their accounts due to Uber's mask-wearing policy;

B. Award Mr. Mahwikizi damages under the California Common Carrier Law, and the UCL;

C. Award Mr. Mahwikizi damaged for breach of contract;

D. Award Mr. Mahwikizi reliance damages for promissory estoppel;

E. Disgorge Uber of its ill-gotten gains attributable to Mr. Mahwikizi's use of Uber; and

F. Award any other relief to Mr. Mahwikizi which this Court deems necessary and proper.

## <u>JURY TRIAL DEMAND</u>

Plaintiff demands trial by jury as to all issues so triable.Dated this 12th day of July, 2022.

<u>/s/ JUSTIN MAHWIKIZI</u>
**JUSTIN MAHWIKIZI**
18430 Francisco Avenue
Homewood IL 60430
Email: justin.mahwikizi@gmail.com
**Pro-Se Litigant**