UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JUSTIN MAHWIKIZI, | |
| Plaintiff, | No. 22 C 3680 |
| v. | Judge Thomas M. Durkin |
| UBER TECHNOLOGIES, INC. AND RASIER, LLC, | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Justin Mahwikizi brought this *pro se* action against Defendants Uber Technologies, Inc. ("Uber") and its wholly owned subsidiary Rasier, LLC ("Rasier") (collectively, "Defendants"), alleging various federal and state law claims related to Uber's mask-wearing policy and classification of drivers as independent contractors. Defendants have moved to compel arbitration. For the following reasons, Defendants' motion [16] is granted.

**Background**

Uber operates a ridesharing platform that matches individuals in need of a ride with drivers willing to provide transportation based on their location. R. 17-1, Chinchilla Decl. ¶ 8. Uber drivers use the Driver App to connect with riders, but they cannot access the ridesharing platform unless and until they accept the platform access agreement ("PAA"). *Id.* at ¶¶ 9, 12.

From approximately 2015 to 2022, Justin Mahwikizi worked as an Uber driver in the Chicago area. R. 7, First Amended Complaint ("FAC") ¶ 11. Most recently,

1

Mahwikizi accepted the January 2022 PAA, which contains an arbitration provision. R. 17-1, Chinchilla Decl. ¶ 17. The provision states that it is governed by the Federal Arbitration Act, 9 U.S.C. §§ 2-4 ("FAA") and applies to all claims between a driver and the company. R. 17-1, Exhibit A to Chinchilla Decl. § 13. The PAA also provides that agreeing to the arbitration provision is not mandatory, that Uber drivers can opt out via email within 30 days, and that the provision survives the termination of a driver's relationship with the company. *Id.* Mahwikizi did not opt out of the arbitration provision within 30 days or at any time thereafter. R. 17-1, Chinchilla Decl. ¶ 20.

In February 2022, Uber deactivated Mahwikizi's Driver App account for purportedly violating Uber's mask-wearing policy. R. 7, FAC ¶ 49; R. 17, Mem. ISO Mot. to Compel Arbitration ¶ 17. Mahwikizi, proceeding *pro se*, filed this suit as "a collective action under 29 U.S.C § 216(b), and as a class action under Federal Rule of Civil Procedure 23(b)(1)." R. 1, Complaint ¶ 1. The Court dismissed his Complaint without prejudice because a *pro se* plaintiff may not represent the interests of other plaintiffs in a collective or class action. *See* R. 5. Mahwikizi then filed his FAC alleging violations of the Fair Labor Standards Act, the Illinois Minimum Wage Act, the California Unfair Competition Law and Common Carrier Law, unjust enrichment, promissory estoppel, breach of contract, and tortious interference with contractual and/or advantageous relations.[1] *See* R. 7, FAC.

---

[1] Mahwikizi asserts in his response to the present motion that he alleges "other counts including Defendants' violation of Mahwikizi's 1st amendment rights, and

On August 25, 2022, defense counsel asked Mahwikizi whether he would voluntarily dismiss the FAC and stipulate to arbitration based on his acceptance of the January 2022 PAA. *See* R. 17, Exhibit 2. After Mahwikizi declined, Defendants brought this motion to compel arbitration and stay proceedings pursuant to the FAA. *See* R. 16.[2]

## Legal Standard

The FAA "governs the enforcement, validity, and interpretation of arbitration clauses in commercial contracts in both state and federal courts." *Jain v. de Mere*, 51 F.3d 686, 688 (7th Cir. 1995). The FAA was enacted to replace "widespread judicial hostility" to the enforcement of arbitration agreements with "a liberal policy favoring arbitration." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). The FAA thus "sweeps broadly, 'requiring courts rigorously to enforce arbitration agreements according to their terms.'" *Wallace v. Grubhub Holdings, Inc.*, 970 F.3d 798, 800 (7th Cir. 2020) (quoting *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018)). But there are limits to its coverage. Relevant here, Section 1 of the FAA provides that "nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1.

---

violation of the American[s] with Disabilities Act." R. 24 at 3. Though he references the First Amendment and Americans with Disabilities Act in his First Amended Complaint, there are no corresponding counts for violations of the same.

[2] Following his response and Defendants' reply, Mahwikizi filed a surreply without leave of court, which raised new arguments. R. 26. The Court denied Defendants' motion to strike Mahwikizi's surreply, and instead granted Defendants leave to file a response to Mahwikizi's surreply. R. 29. The Court considers the arguments raised in Mahwikizi's surreply and in Defendants' response.

To compel arbitration under the FAA, this Court must find "[1] a written agreement to arbitrate, [2] a dispute within the scope of the arbitration agreement, and [3] a refusal to arbitrate." *See Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 690 (7th Cir. 2005). The party opposing arbitration bears the burden of establishing why the arbitration provision should not be enforced. *Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79, 91 (2000); *Wallace*, 970 F.3d at 803.

A motion seeking dismissal pursuant to an arbitration agreement is best conceptualized as an objection to venue and thus properly brought under Rule 12(b)(3). *See Automobile Mechanics Local 701 Welfare and Pension Funds v. Vanguard Car Rental USA, Inc.*, 502 F.3d 740, 746 (7th Cir. 2007). Generally, in considering Rule 12(b)(3) motions, a court must construe all facts and draw all reasonable inferences in favor of the plaintiff, unless the defense offers evidence to the contrary. *Faulkenberg v. CB Tax Franchise Systems, LP*, 637 F.3d 801, 806 (7th Cir. 2011). If the parties submit evidence outside of the pleadings, a court may consider it without converting the motion into one for summary judgment. *Id.* at 809–10.

## Analysis

Mahwikizi does not dispute that he agreed to the arbitration provision or argue that his failure to opt out should be excused, that the provision is unenforceable under

4

Illinois law, or that his claims are outside of its scope.[3] Rather, Mahwikizi asserts that he is exempted under Section 1 of the FAA because, as an Uber driver, he was a member of a "class of workers engaged in foreign or interstate commerce." R. 24 at 1.

To determine whether Mahwikizi falls within the residual clause of Section 1, the Court must first define the relevant "class of workers" and then determine whether that class of workers is "engaged in foreign or interstate commerce." *Southwest Airlines Co. v. Saxon*, 142 S. Ct. 1783, 1788 (2022). The focus of the first step is on the class of workers, not the employer. *Id.* In other words, Mahwikizi is a member of a class of workers based on what he does as an Uber driver, not what Defendants do generally. *Id.* The inquiry at the second step is whether that class is "actively engaged" in the transportation of goods across borders through the channels of foreign or interstate commerce. *See id.* at 1790 (citations omitted). At this step, the Court "consider[s] whether the interstate movement of goods is a central part of the class members' job description." *Wallace*, 970 F.3d at 801.

Because the parties do not dispute the class of workers is Uber drivers nationwide, the Court turns to the question of whether that class is engaged in interstate commerce. As Defendants point out and as Mahwikizi recognizes, the overwhelming majority of courts across the country that have considered this precise

---

[3] Mahwikizi made these arguments in his original 35-page response to Defendants' motion. *See* R. 20. After Defendants flagged that his response exceeded the 15-page limit set by the Court's Standing Order, *see* R. 21, Mahwikizi stated in a surreply that he had inadvertently filed the wrong version of his response. *See* R. 22. This Court granted Mahwikizi leave to file the correct document. *See* R. 23. The revised response did not include these arguments, *see* R. 24, so the Court will not consider them.

5

question have concluded that rideshare drivers are not engaged in interstate commerce within the meaning of Section 1. *See, e.g.*, *Cunningham v. Lyft*, 17 F.4th 244 (1st Cir. 2021); *Capriole v. Uber Technologies*, 7 F.4th 854 (9th Cir. 2021); *Leaks v. Uber Techs., Inc.*, No. 20 C 6423 (N.D. Ill. Feb. 22, 2022);[4] *Davarci v. Uber Technologies*, No. 20-CV-9224, 2021 WL 3721374 (S.D.N.Y. Aug. 20, 2021); *Osvatics v. Lyft, Inc.*, 535 F. Supp. 3d 1 (D.D.C. 2021); *Rogers v. Lyft, Inc.*, 452 F. Supp. 3d 904 (N.D. Cal. 2020), *aff'd*, No. 20-15689, 2022 WL 474166 (9th Cir. Feb. 16, 2022); *Aleksanian v. Uber Techs., Inc.*, 524 F. Supp. 3d 251 (S.D.N.Y. 2021). Their reasoning is equally applicable here.

Uber drivers provide transportation services that are predominately local and intrastate in nature. Of all trips taken through the Uber platform between 2015 and 2021, approximately 97.54% started and ended in the same state, and the average trip was 6.32 miles and 16.41 minutes in duration.[5] R. 25-1, Exhibit 4 ¶ 4. While Mahwikizi asserts that he and other drivers "frequently" take riders across state lines, the only evidence he offers in support is his own estimation that he transported

---

[4] Defendants assert that this Court must reach the same conclusion as Judge Pacold reached in *Leaks* because that case presented the "exact issues in dispute here." R. 25 at 2. It is well-settled that decisions of other district courts in the same district are not binding, though they may be persuasive. *Van Straaten v. Shell Oil Products Co. LLC*, 678 F.3d 486, 490 (7th Cir. 2012). The case that Defendants cite, *Brengettcy v. Horton*, does not hold to the contrary. *Brengettcy* involved the transfer of a case, for administrative reasons, from one district judge to another. 423 F.3d 674, 679-80 (7th Cir. 2005). There was no reassignment here, so this Court is under no obligation to reach the conclusion Judge Pacold reached in *Leaks*.

[5] The figures were calculated "using a statistically representative random sample of drivers with completed trips and non-completed trips with positive mileage." R. 25-1, Exhibit 4 ¶ 4 n.1. The sample size was more than 390 million trips, or 6.25% of all trips. *Id.*

riders across state lines on a daily basis. R. 24-1 ¶¶ 4, 7. The data does not support his estimation,[6] but even if it did, his experience is not determinative of whether the class of Uber drivers to which he belongs is engaged in interstate commerce for the purpose of Section 1 of the FAA. *See Wallace*, 970 F.3d at 798; *see also Aleksanian*, 524 F. Supp. 3d at 261.

Still, Uber drivers sometimes cross state lines. In *International Brotherhood of Teamsters Local Union No. 50 v. Kienstra Precast, Inc.*, the Seventh Circuit held that cement truck drivers who crossed state lines on roughly two percent of their delivery trips fell within the Section 1 exemption. 702 F.3d 954, 958 (7th Cir. 2012); *see also Cent. States, Se. & Sw. Areas Pension Fund*, 84 F.3d 988, 993 (7th Cir. 1996). Mahwikizi argues that under this standard, the percentage of drivers' trips that involve crossing state lines (approximately 2.46%) is sufficient. But more recently in *Wallace*, the Seventh Circuit clarified the inquiry as whether "the interstate movement of goods is a *central part* of the class members' job description," and that "someone whose occupation is not defined by its engagement in interstate commerce does not qualify for the exemption just because she occasionally performs that kind of work." 970 F.3d at 803 (emphasis added). The Seventh Circuit reiterated this inquiry in *Saxon*. 993 F.3d 492, 497 (7th Cir. 2021), *aff'd*, 142 S. Ct. 1783 ("To be engaged in commerce for purposes of § 1, then, is to 'perform[ ] work analogous to

---

[6] While Mahwikizi estimates that he drove riders across state lines on a daily basis, the data shows that the average trip distance was approximately 6.59 miles, the average trip duration was 18.23 minutes, and only 0.99% of his trips started and ended in different states. R. 25-1, Exhibit 4 ¶ 6.

that of seamen and railroad employees, whose occupations are *centered on* the transport of goods in interstate and foreign commerce.'") (quoting *Wallace*, 970 F.3d at 801–02) (emphasis added).

Applying that standard, interstate transport is not a central feature of Uber drivers' jobs. The data reflects that Uber drivers "are in the general business of giving people rides, not the particular business of offering interstate transportation to passengers." *Rogers*, 452 F. Supp. 3d at 916 ("Interstate trips that occur by happenstance of geography do not alter the intrastate transportation function performed by the class of workers."). That drivers like Mahwikizi sometimes incidentally take riders across state lines does not make their occupations "centered on" the interstate movement of goods, like seamen and railroad workers. *Wallace*, 970 F.3d at 802; *see also Capriole*, 7 F.4th at 864-65 (distinguishing Uber drivers from seamen and railroad workers for whom "the interstate movement of goods and passengers over long distances and across national or state lines is an indelible and 'central part of the job description'") (quoting *Wallace*, 970 F.3d at 803). Nor does the fact that Uber drivers sometimes place riders' belongings into their vehicles, which are occasionally headed across state lines, make them like the airline employees in *Southwest Airlines* who loaded cargo into airplanes and fell within the Section 1 exemption.

Likewise, the fact that Uber drivers occasionally take riders to and from airports and bus and train stations does not mean they are themselves "engaged in interstate commerce." Even if Uber drivers like Mahwikizi are transporting riders

8

headed or returning from out of state, the residual exemption is about what the worker does, not just where the passengers or goods have been. *Wallace*, 970 F.3d at 802. And as the Supreme Court held in the antitrust context, "when local taxicabs merely convey interstate train passengers between their homes and the railroad station in the normal course of their independent local service, that service is not an integral part of interstate transportation." *United States v. Yellow Cab Co.* 332 U.S. 218, 233 (1947), *overruled on other grounds by Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984). The taxicab drivers' relationship to interstate commerce was "only casual and incidental" because they were required to serve all city residents rather than only railroad passengers, they had no contractual or other arrangement with the railroads, and their fares were paid and collected separately from the railroad fares. *Id.* at 232–33.

Uber is, in essence, "a technologically advanced taxicab company, allowing people to 'hail' rides from its drivers from pretty much anywhere to pretty much anywhere." *See Rogers*, 452 F. Supp. 3d at 916. Like taxicab drivers, Uber drivers sometimes take riders between their homes and transit hubs. But there is no evidence of any arrangement with the airlines, railroad, or bus companies to do so. In other words, there is no "established link between such intrastate rideshare trips and the channels of commerce that are designed to facilitate passengers' interstate journeys." *Osvatics*, 2021 WL 1601114, at *15 (citing *Yellow Cab*, 332 U.S. at 230–33; *Rogers*, 452 F. Supp. 3d at 917); *see also Capriole*, 7 F.4th at 865; *Cunningham*, 17 F.4th at 250–53.

Mahwikizi argues that Uber for Business provides that link. He asserts that through Uber for Business, Defendants contract with businesses such as consulting firms and trucking companies to provide transportation services specifically for their employees' interstate business travel. According to Mahwikizi, these employers direct their employees to use Uber as the only mode of transportation during their business trips. In his view, this makes Uber drivers an integral step in the employees' interstate journeys, like the delivery drivers in *Rittmann v. Amazon.com*.[7]

At the outset, Mahwikizi's description of Uber for Business is inaccurate. Uber for Business is a platform through which employers organize and streamline expense tracking for employees' meals and transport, whether within their home city or elsewhere. *See* R. 24-2, Exhibit B; R. 25-1, Exhibit 3 ¶ 3. The materials he cites do not indicate that traveling employees are limited to using Uber during their interstate travel, as opposed to a taxi, another rideshare service, a rental car, or otherwise. *See* R. 24-2. That may very well be the experience of certain riders that Mahwikizi has met, but there is no evidence that mandatory use of Uber in interstate travel is a feature of Uber for Business.

And as previously discussed, the inquiry is not whether Uber or even riders are engaged in interstate commerce but whether the class of Uber drivers is. *Southwest Airlines*, 142 S. Ct. at 1788. Here, Mahwikizi has not shown any material difference between the work Uber drivers perform through Uber for Business and

---

[7] On this basis, Mahwikizi also asserts that the interstate trip data is flawed because it does not include every ride procured through Uber for Business as part of an employee's business trip, even if a ride does not involve crossing a state border.

outside of it. And as previously discussed, that work is predominately local and intrastate. He does not contend, for example, that Uber for Business makes it so that Uber drivers serve *only* riders traveling interstate. *Cf. Yellow Cab*, 332 U.S. at 231. To the contrary, Uber drivers serve riders who are, by happenstance, employed by companies that utilize Uber for Business as well as those who are not. *See* R. 25-1, Exhibit 3 ¶ 3.

Nor does Uber for Business create a contractual or any other arrangement between the Uber drivers and the means of interstate transit, such as the airlines. *Cf. Yellow Cab*, 332 U.S. at 231. Mahwikizi does not claim that, through Uber for Business, airlines hire Uber drivers to provide transportation for their passengers, or that those passengers arrange for Uber transport through the airlines. *See Cunningham*, 17 F.4th at 251 ("The Lyft driver contracts with the passenger as part of the driver's normal local service to take the passenger to the start (or from the finish) of the passenger's interstate journey."). Even in the context of Uber for Business then, Uber drivers' "relationship to interstate transit is only casual and incidental." *Rogers*, 452 F. Supp. 3d at 917 (quoting *Yellow Cab*, 332 U.S. at 231).

Moreover, *Rittmann* is inapposite. In that case, the Ninth Circuit held that "last mile" Amazon Flex drivers, who were specifically hired by Amazon to complete the delivery of goods that Amazon shipped across state lines, fell within the exception based, in part, on the interstate nature of Amazon's business. 971 F.3d 904, 917 (9th Cir. 2020). But the Ninth Circuit has since distinguished *Rittmann* in holding that Uber drivers are not a class of workers engaged in interstate commerce. *Capriole*, 7

11

F.4th at 866-67 (explaining that "even when transporting passengers to and from transportation hubs as part of a larger foreign or interstate trip, Uber drivers are unaffiliated, independent participants in the passenger's overall trip, rather than an integral part of a single, unbroken stream of interstate commerce like AmFlex workers").

Mahwikizi lastly contends that Uber's processes around airport pickups make Uber drivers the last leg of an integrated interstate journey. But the fact that Uber contracts with airports for access to nearby staging lots and requires drivers to pick up riders at designated areas at the airport does not alter the essentially local nature of Uber drivers' work.[8] *See Davarci*, 2021 WL 3721374, at *14. This is not the engagement in interstate commerce contemplated by the FAA.

Therefore, this Court concludes that Uber drivers like Mahwikizi do not fall within Section 1 of the FAA as a "class of workers engaged in foreign or interstate commerce." As such, the arbitration provision Mahwikizi agreed to is not exempt from enforcement under the FAA.

---

[8] Mahwikizi also calls Defendants' arrangement with airports, "wharfage to transportation hubs." R. 24 at 4. The Court is not entirely clear what he means by this. But the agreements to access staging lots near the airports are not "wharfage" agreements. A "wharfage" refers to "the provision or the use of" a cargo-loading facility. Merriam-Webster, "wharfage", https://www.merriam-webster.com/dictionary/ wharfage; *see also Southwest Airlines*, 142 S. Ct at 1790 (citing Black's Law Dictionary 1226 ("[m]oney paid for landing wares at a wharf, or for shipping or taking goods into a boat or barge from thence")). And Mahwikizi does not claim that there is any cargo loading happening at the staging lots.

## Conclusion

For the foregoing reasons, Defendants' motion to compel arbitration is granted, and the case is stayed pending arbitration.

ENTERED:

_____

Honorable Thomas M. Durkin
United States District Judge

Dated: March 6, 2023